# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| LIMETREE BAY SERVICES, LLC, *et al*,[1] | § | Case No. 21-32351 (DRJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |
| | § | |
| LIMETREE BAY TERMINALS, LLC d/b/a | § | |
| OCEAN POINT TERMINALS and DAVID M. | § | |
| DUNN, AS LIQUIDATING TRUSTEE OF | § | |
| THE LBR LIQUIDATING TRUST, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | **Adversary No. 22-03306** |
| | § | |
| EUCLID ENVIANT, LLC f/k/a/ EUCLID | § | **JURY TRIAL DEMANDED** |
| ENVIRONMENTAL UNDERWRITERS, LLC | § | |
| d/b/a ENVIANT and CERTAIN | § | |
| UNDERWRITERS AT LLOYD'S, LONDON | § | |
| SUBSCRIBING TO POLICY NOS. | § | |
| ENVP0000296-20 and ENVX0000256-20, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## SECOND AMENDED COMPLAINT

Plaintiffs, Limetree Bay Terminals, LLC d/b/a Ocean Point Terminals ("LBT") and David

M. Dunn, as Liquidating Trustee for the LBR Liquidating Trust (the "Trustee" and together with

LBT, the "Plaintiffs"), file this Second Amended Complaint for damages and declaratory judgment

against the Defendants, Euclid Enviant, LLC f/k/a Euclid Environmental Underwriters, LLC and

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Limetree Bay Services, LLC (1866); Limetree Bay Refining Holdings, LLC (1776); Limetree Bay Refining Holdings II, LLC (1815); Limetree Bay Refining, LLC (8671); Limetree Bay Refining Operating, LLC (9067); Limetree Bay Refining Marketing, LLC (9222).

Certain Underwriters at Lloyd's, London Subscribing to Policy Nos. ENVP0000296-20 and ENVX0000256-20 (collectively, "<u>Insurers</u>"), alleging as below.

Plaintiffs file this Second Amended Complaint to amend their prior complaint based on the Court's comments at the January 5, 2024 conference.

## I.      INTRODUCTION

1.      This is an insurance coverage lawsuit. LBT owns and operates a petroleum product storage facility and associated docking facilities (the "<u>Terminal</u>"). The Trustee is the successor-in-interest to Limetree Bay Refining, LLC ("<u>LBR</u>"), a debtor in these Chapter 11 cases and the former owner of a petroleum refinery (the "<u>Refinery</u>") located adjacent to the Terminal on a 2,000-acre site on the southern coast of St. Croix (the "<u>Limetree Bay Site</u>"). Insurers issued pollution liability insurance policies to LBT and LBR to cover pollution-related risks arising out the Terminal and the Refinery.[2]

2.      After Insurers issued the pollution liability policies to Plaintiffs and before LBR initiated its bankruptcy proceeding, several lawsuits were filed against LBT, LBR, and other defendants. The Underlying Lawsuits (defined below) alleged that LBT, LBR, and the other defendants are liable for bodily injury, property damage, and cleanup expenses resulting from the discharge of pollutants from the Refinery. The claims in the Underlying Lawsuits are covered by the Insurers' pollution liability policies, and LBT and LBR sought insurance coverage and a defense from Insurers for the Underlying Lawsuits.

---

[2]      The policies were issued to Limetree Bay Ventures, LLC and its subsidiaries, which include LBT and LBR. Under the Plan (defined below) and as discussed herein, the Trustee is the successor-in-interest to LBR and has standing and authority to pursue rights and claims under these policies.

3.       Insurers refused to cover the Underlying Lawsuits, contending that insurance policies other than Insurers' pollution liability policies should provide coverage before Insurers must provide coverage. Insurers' position is incorrect.

4.       Other insurance clauses do not allow insurers to avoid providing coverage to their policyholders. Instead, an other insurance provision allow insurers to seek contribution from other insurers, after they pay their policyholder. Thus, Insurers' reliance on an other insurance provision to refuse coverage is improper.

5.       Even if the other insurance provision were a basis for Insurers to avoid providing coverage, it would not bar coverage here because there is no "other valid and collectible insurance or indemnification" "available for" losses Plaintiffs are seeking under Insurers' policies. No other insurance company has yet paid Plaintiffs any money, and as described below, there are significant gaps between the reimbursement LBT may eventually receive from other insurers and the amounts Plaintiffs seek to recover from Insurers here. Thus, the other insurance clause does not bar coverage for amounts Plaintiffs are seeking to recover under Insurers' policy here, because there is no "other valid and collectible insurance or indemnification" "available for" those amounts.

6.       In sum, Insurers' refusal to defend or provide coverage to Plaintiffs in the Underlying Lawsuits is a breach of the insurance contracts and amounts to bad faith.

## II.       PARTIES

7.       Plaintiff Limetree Bay Terminals, LLC d/b/a Ocean Point Terminals is a limited liability company with operations based in the U.S. Virgin Islands.

8.       Plaintiff David M. Dunn, as the Liquidating Trustee of the LBR Liquidating Trust, is an individual residing in Stamford, Connecticut.

9.       Defendant Euclid Enviant, LLC f/k/a Euclid Environmental Underwriters, LLC does business as Enviant. Defendant Euclid Enviant, LLC f/k/a Euclid Environmental

Underwriters LLC may be served with process under Bankruptcy Rule 7004(b) at 250 Park Avenue, 7th Floor New York, NY 10017.

10.     Certain Underwriters at Lloyd's, London Subscribing to Policy Nos. ENVP0000296-20 and ENVX0000256-20, are organized under the laws of the United Kingdom with their principal place of business in the United Kingdom and may be served with process under Bankruptcy Rule 7004(b) through their appointed agent, Enviant, 250 Park Avenue, 7th Floor New York, NY 10017.

### III.     JURISDICTION AND VENUE

11.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2) and this Court may enter a final order or judgment consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

12.     This adversary proceeding is commenced under Section 105(a) of Title 11 of the United States Code (the "Bankruptcy Code"), Section 2201 of Title 28 of the United States Code, and Rules 7001(2) and (9) of the Federal Rules of Bankruptcy Procedure.

13.     Under Bankruptcy Rule 7008 and Rule 7008-1 of the Bankruptcy Local Rules for the Southern District of Texas, Plaintiffs consent to the entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

### IV.     FACTUAL BACKGROUND

14.     The Terminal and the Refinery are located adjacent to each other on the Limetree Bay Site. Historically, the Terminal and Refinery have shared certain resources and facilities in connection with the operation of their businesses. When operating, the Refinery can process over

200,000 barrels of crude oil and other feedstocks per day. The Terminal can store up to 34,000,000 barrels of barrel crude and petroleum product.

15.     On July 12, 2021, LBR and certain of its affiliates (the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in this Court. LBT was not and is not a Debtor. On December 21, 2021, the Court entered an order approving the sale of the Refinery and substantially all the other assets of the Debtors to certain third parties.[3] On May 20, 2022, the Court entered an order [Case No. 21-32351, Docket No. 1454] approving and confirming the *Combined Disclosure Statement and Chapter 11 Plan of Liquidation of Limetree Bay Services, LLC and Affiliated Debtors* (the "Plan"). On June 10, 2022, the Effective Date of the Plan occurred.[4]

16.     Under the Plan, on the Effective Date, the Liquidating Trust was established, the Trustee was appointed as the Liquidating Trustee, and the Debtors' remaining assets, including all Causes of Action and Insurance Policies, vested in the Liquidating Trust.[5] The Trustee is the representative of the Debtors' estates under Sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code and is vested with the power and authority to administer the Debtors' estates and the Liquidating Trust Assets, including, without limitation, pursuing all Causes of Action or other claims related to the Insurance Policies.

17.     LBR's rights under the Pollution Policies were assets of the Debtors' estates, which have now vested in the Liquidating Trust, and proceeds from those policies may be available to provide a recovery to creditors in these Chapter 11 cases.

---

[3]     *See* Case No. 21-32351, Docket No. 977.

[4]     *See* Case No. 21-32351, Docket No. 1511.

[5]     *See* Plan Arts. IX, X, and XIV.D.

## V.     THE LAWSUITS

18.     Plaintiffs and other parties were sued in four putative class action proceedings and by the United States of America relating to alleged pollution. The putative class action proceedings are *Cotton v. Limetree Bay Ventures, LLC*, Case No. 1:21-cv-00261 (D.V.I.), *Shirley v. Limetree Bay Ventures LLC*, Case No. 1:21-cv-00259 (D.V.I.), *Boynes v. Limetree Bay Ventures, LLC*, Case No. 1:21-cv-00253 (D.V.I.), and *Charles v. Limetree Bay Ventures, LLC*, Case No. 1:21-cv-00260 (D.V.I) (the "Putative Class Actions"). The United States of America's lawsuit is an action styled *United States of America v. Limetree Bay Refining, LLC*, No. 1:21-cv-264 (D.V.I) (together with the Putative Class Actions, the "Underlying Lawsuits").

19.     The Underlying Lawsuits allege that LBT and LBR (as well as other defendants) are liable for bodily injury, property damage, and clean-up expenses resulting from one or more pollution incidents that occurred at the Refinery.

20.     The Refinery at which the alleged pollution occurred is a covered location under the Pollution Policies.

21.     Plaintiffs have spent millions of dollars, and will continue to incur expenses, defending themselves in the Underlying Lawsuits.

## VI.    PLAINTIFFS' INSURANCE PROGRAM

22.     As Insurers acknowledge, Plaintiffs' insurance program is made up of "four towers of liability insurance," each of which starts with primary insurance. ECF No. 55 ¶¶ 12, 22; ECF No. 52 ¶ 53.

23.     Insurance towers usually consist of a primary insurance policy and one or more excess insurance policies. Once a loss exceeds the primary policy's coverage limit, coverage is triggered under the first excess policy. Other excess policies may then sit atop the first excess policy.

24.     One of the four insurance towers is the pollution liability insurance. As Insurers acknowledge, the "Pollution Tower consists of Underwriters' Policy No. ENVP0000296-20, which is the primary layer . . ., and four layers of excess pollution coverage" and "Underwriters' Policy No. ENVX0000256-20 is the first layer of excess pollution coverage[.]" ECF No. 55 ¶ 22.

25.     There are additional excess pollution liability policies that apply after Insurers' primary policy and excess policy have paid their limits.

26.     Another of the four insurance towers is the "Owner Controlled Insurance Program," which is referred to as OCIP. As Insurers acknowledge, the "primary layer in the OCIP GL Tower is insured by QBE." ECF No. 55 ¶ 13.

27.     There are excess OCIP policies that apply after the OCIP primary policy.

28.     Another of the four insurance towers is the "contractors pollution liability" insurance, which is referred to as CPL. As Insurers acknowledge, there is one primary policy, issued by Lexington/AIG. ECF No. 55 ¶ 15; ECF No. 52 ¶ 53 (referring to Lexington/AIG as a "primary insurer[]").

29.     Another of the four insurance towers is the general liability insurance, which is referred to as GL. As Insurers acknowledge, Chaucer Group and Apollo Syndicate are the "primary insurers" in the GL tower and that primary insurance is subject to a "$10 million self-insured retention." ECF No. 52 ¶ 53; ECF No. 55 ¶ 16.

30.     There are excess GL policies that apply after the primary GL insurance issued by Chaucer and Apollo.

31.     Appendix A contains a visual representation of these four insurance towers.

**VII.    THE POLLUTION LIABILITY POLICIES COVER THE LAWSUITS**

32.     As detailed below, the Insurers' primary insurance policy and excess insurance policy cover the Underlying Lawsuits.

A.      **The Primary Policy**

33.      Insurers issued a Primary Policy numbered ENVP0000296-20 to Plaintiffs and others (the "Primary Policy"). Exhibit A is the policy that Insurers assert is the Primary Policy. Whether Exhibit A is an accurate version of the Primary Policy is a question of fact requiring discovery in this case because one or more of the endorsements was not contained in Plaintiffs' copy of the Primary Policy. *See infra* ¶ 62.

34.      Plaintiffs are insureds under the Primary Policy.

35.      The Primary Policy aggregate limit is $1,000,000.

36.      The Primary Policy self-insured retention is $500,000 per pollution condition. Limetree's covered losses have exceed that self-insured retention.

1.      **Primary Policy Insurers**

37.      The Primary Policy defines "Insurer" to mean "the entity set forth in Item 8. (c) of the Declarations."

38.      Enviant is the only entity set forth in Item 8. (c), so Enviant is an "Insurer."

39.      The Primary Policy also contains an endorsement titled "Schedule of Participation."

40.      Syndicates 1458, 4472, 3334, 1084, and 2987 are syndicates at Lloyd's, London and are listed on the Schedule of Participation in the Primary Policy.

41.      RenaissanceRe Corporate Capital (UK) Limited is the only member of Syndicate 1458.

42.      Liberty Corporate Capital Limited is the only member of Syndicate 4472.

43.      Hamilton Corporate Member Limited is the only member of Syndicate 3334.

44.      Upon information and belief, Chaucer Corporate Capital No. 2 Limited is the only member of Syndicate 1084.

45.     Brit UW Limited is the only member of Syndicate 2987.

46.     By agreement of the parties, Plaintiffs named Certain Underwriters at Lloyd's, London Subscribing to Policy Nos. ENVP0000296-20 and ENVX0000256-20 ("Underwriters") as defendants rather than identifying each of the preceding individual entities listed on the Schedule of Participation. ECF No. 23.

47.     Because the Primary Policy identifies Enviant and Underwriters as the insurers, this Complaint refers to Enviant and Underwriters collectively as Insurers.

### 2.     Primary Policy Insuring Agreement

48.     Section I of the Primary Policy is titled INSURING AGREEMENTS and sets forth what Insurers agreed to insure.

49.     In the Legal Liability for Clean-Up Expense Insuring Agreement in Coverage Section 1, the Primary Policy provides coverage for the following: "The **insurer** will pay on behalf of the **insured** those sums that the **insured** becomes legally obligated to pay as **loss** because of **clean-up expense** resulting from a **pollution condition** on, at, under, or migrating from or through a **covered location**."

50.     In the Legal Liability for Bodily Injury and Property Damage Insuring Agreement in Coverage Section 1, the Primary Policy proves coverage for the following: "The **insurer** will pay on behalf of the **insured** those sums that the **insured** becomes legally obligated to pay as **loss** because of **bodily injury** or **property damage**, resulting from a **pollution condition** on, at, under, or migrating from or through a **covered location**."

51.     Coverage Section 1 of the Primary Policy—the section with the relevant insuring agreements—has no language conditioning the application of those insuring agreements on other insurance, or stating that the Primary Policy is an excess policy, or stating that the Primary Policy

will pay only after the limits of other insurance are paid. The insuring agreements are thus triggered as primary coverage.

52.   The Primary Policy contains the following defined terms:

a.   **Bodily injury** means physical injury, sickness, mental anguish, shock or emotional distress or disease sustained by a person, including death resulting therefrom. **Bodily injury** also includes medical monitoring cost when accompanied by physical injury.

b.   **Clean-up expense** means reasonable and necessary expense, including **legal expense** and **restoration expense**, incurred with the **insurer's** prior written consent, to investigate, abate, contain, treat, remove, remediate, monitor, neutralize or dispose of contaminated soil, surface water or groundwater caused by a **pollution condition** but only:

   i.   To the extent required by **environmental law** or, in the absence of applicable **environmental law**, as determined to be reasonable and necessary by an **environmental professional**;

   ii.   If required to satisfy a **voluntary clean-up program**; or

   iii.   If incurred by any governmental entity of the United States of America including its territories and possessions, Puerto Rico or Canada, or by a third-party.

c.   **Covered location** means real property owned or managed by, or leased or rented to, the **insured** and listed in Item 9. of the Declarations.

d.   **Loss** means, as applicable for each Coverage:

   i.   Damages because of **bodily injury** or **property damage**;

   ii.   **Clean-up expense**;

   iii.   **Emergency response expense**;

   iv.   **Business interruption expense** and **extra expense**; and

   v.   **Legal expense**.

   **Loss** does not include **crisis management expense** or Supplementary Payments.

e.   **Pollution condition** means:

  i.   The discharge, emission, seepage, migration, dispersal, release or escape, or illicit abandonment by a third party without the **insured's** consent, of any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapors, soot, fumes, acids, alkalis, chemicals, hazardous substances, petroleum hydrocarbons, low-level radioactive matter or waste, medical, infectious or pathological waste or waste materials, methamphetamines, electromagnetic fields, or **biological agent** into or upon land, or any structure on land, the atmosphere or any watercourse or body of water including groundwater, provided such condition is not naturally present in the environment in the concentration or amounts discovered; or

  ii.   **Microbial matter** or legionella pneumophila in any structure on land and the atmosphere contained within that structure.

f.   **Property damage** means:

  i.   Physical injury to tangible property of parties other than an **insured**, including all resulting loss of use and diminished value of such property;

  ii.   Loss of use of tangible property of parties other than an **insured** that is not physically injured or destroyed, arising out of physical injury to or destruction of other tangible property; or

  iii.   **Natural resource damage**.

53.   Property damage as defined in the Primary Policy does not include clean-up expense.

54.   The Primary Policy covers the Underlying Lawsuits because the Underlying Lawsuits allege Plaintiffs are liable for loss because of clean-up expense and "**bodily injury** or **property damage**, resulting from a **pollution condition** on, at, under, or migrating from or through a **covered location**."

55.   No exclusion in the Primary Policy bars coverage for the Underlying Lawsuits.

**3.   Primary Policy Defense Obligation**

56.   The Primary Policy also provides that Insurers have "the right and duty to defend the **insured** against any **claim** to which this insurance applies."

57.     Under the Primary Policy, "**[l]egal expense** incurred for the investigation and defense of any **claim** shall erode the applicable Limits of Liability" and Insurers' "duty to defend ends when the applicable Limits of Liability are exhausted by payment of **loss**." "Loss" includes "legal expense."

58.     As described above, the insurance applies to the Underlying Lawsuits.

59.     Insurers therefore have the duty to defend the Underlying Lawsuits.

60.     Because Plaintiffs' legal expense has far exceeded the total of the self-insured retention and the $1,000,000 limit of the Primary Policy, Insurers must pay the full $1,000,000 limit to Plaintiffs. After Insurers pay that amount to Plaintiffs for covered loss, Insurers' duty to defend under the Primary Policy will end, and the Primary Policy will be exhausted.

### 4.     Primary Policy "Other Insurance" Clause

61.     Insurers have refused to provide coverage, relying on the Primary Policy's other insurance clause as a defense to coverage.

62.     Insurers have contended that an Endorsement No. 31 contains the operative other insurance clause that purportedly gives rise to a coverage defense. *E.g.*, ECF No. 52 ¶ 29. Whether that is true requires discovery because Endorsement No. 31 was not contained in Plaintiffs' copy of the Primary Policy and was first obtained by counsel for Plaintiffs from Enviant in July 2022.

63.     Endorsement No. 31 provides in pertinent part:

### K.     Other Insurance

If other valid and collectible insurance or indemnification is available for any **loss** covered under this Policy, the **insurer's** obligations are limited as follows:

1.     This insurance shall be excess insurance over any policy(ies) which are available for **loss** covered under this Policy including but not limited to those policies scheduled below on this Endorsement including any renewals or replacements thereof. Where this insurance is excess the **insurer** will only pay its share of those amounts of **loss** that exceed the amounts covered by such insurance policies

. . .

64.     Even assuming it is the operative endorsement, Endorsement No. 31 does not affect Insurers' coverage obligations for two reasons.

65.     *First*, any other insurance provision in the Primary Policy does not affect whether Insurers owe coverage to Plaintiffs now. Other insurance clauses only govern the relationship between insurers; they do not affect Plaintiffs' right here to first recover from Insurers now.

66.     *Second*, even if an other insurance provision allowed Insurers to avoid their coverage obligations, it does not allow Insurers to refuse coverage for Plaintiffs' losses where, as here, no other "valid and collectible" insurance is "available" for those losses.

67.     No other insurer has reimbursed a single dollar of defense costs, so no other "valid and collectible" insurance is "available" to Plaintiffs. And to the extent other insurers have said they intend to pay for certain defense costs, there will remain numerous gaps in coverage, which means there is no "valid and collectible" insurance "available" for certain defense costs and losses.

68.     Here, two of the three other insurance "towers" of coverage—the GL tower and the OCIP tower—have refused to defend Plaintiffs in the Underlying Lawsuits or to pay any amounts to Plaintiffs.

69.     The CPL insurer has agreed to partially defend LBT under a reservation of rights. It has not paid Plaintiffs any money to date. Even if the CPL insurer did ultimately pay LBT some money, the CPL insurer has refused to defend LBT in parts of the Underlying Lawsuits, including a denial of coverage in *Shirley* and a refusal to pay any costs to defend a preliminary injunction motion in the Underlying Lawsuits. In addition, the CPL insurer has not provided any coverage to the Trustee. The CPL insurance therefore is not "valid and collectible" insurance "available" for a substantial portion of Plaintiffs' losses.

70.     Certain third parties performing work at the Limetree Bay Site also had liability insurance, under which LBT has sought insurance coverage as an additional insured. Every third-party insurer, except one, has refused to defend LBT. Like the CPL insurer, the one third-party insurer that has agreed to defend LBT—Chubb—has refused to defend LBT in parts of the Underlying Lawsuits, including a denial of coverage in *Shirley* and *Charles* and a refusal to pay any loss before August 4, 2023. Chubb has not provided coverage for the Trustee. Chubb's coverage therefore is not "valid and collectible" insurance "available" for a substantial portion of Plaintiffs' losses.

71.     Finally, the provision in the potentially applicable other insurance clauses setting for the requirements "[w]here this insurance is excess of the indemnity scheduled below" do not apply because there are no indemnity obligations under the scheduled agreements for the Underlying Lawsuits.

72.     In sum:

a.     For past defense costs/losses,

    i.     no insurer has paid anything;

    ii.    The OCIP and GL tower insurers have refused to defend Plaintiffs in the Underlying Lawsuits or to pay any amounts to Plaintiffs;

    iii.   no insurer has agreed to reimburse any defense costs associated with *Shirley*;

    iv.    no insurer has agreed to reimburse any pre-August 4, 2023 defense costs in connection with the preliminary injunction motion; and

    v.     no insurer has agreed to reimburse any amounts incurred by the Trustee; and

b.     For future defense costs/losses,

    i.     The OCIP and GL tower insurers have refused to defend Plaintiffs in the Underlying Lawsuits or to pay any amounts to Plaintiffs;

    ii.    no insurer has agreed to cover *Shirley*; and

           iii.    no insurer has agreed to cover all defense costs in the Underlying Lawsuits

73.     In other words, no "valid and collectible" insurance is "available" for a substantial portion of the amounts Plaintiffs seek in this lawsuit.

**B.    The Excess Policy**

74.     Underwriters issued a pollution liability excess policy numbered ENVX0000256-20 to Plaintiffs and others (the "<u>Excess Policy</u>"; together with the Primary Policy, the "<u>Pollution Policies</u>"). Exhibit B is the policy that Underwriters assert is the Excess Policy.

75.     Plaintiffs are insureds under the Excess Policy.

76.     The policy's "Each Incident Limit" is $9,000,000 and the "Aggregate Limit" is $9,000,000.

### 1.    Excess Policy Insurers

77.     The Excess Policy contains an endorsement titled "Schedule of Participation."

78.     That Schedule of Participation identifies the same entities as the Schedule of Participation in the Primary Policy. *Supra* ¶¶ 39-45.

79.     By agreement of the parties, Plaintiffs named Underwriters as defendants instead of identifying each of the entities listed on the Schedule of Participation. ECF No. 23.

80.     Because the Excess Policy identifies Underwriters as the insurers, this Complaint refers to Underwriters when referencing only the Excess Policy.

### 2.    Excess Policy Insuring Agreement

81.     The Insuring Agreement in the Excess Policy states: "We will pay on the insured's behalf **ultimate net loss** in excess of the limits of insurance of **underlying insurance**, and, except as otherwise provided herein, in accordance with the same terms, conditions, exclusions,

limitations and warranties contained in **controlling underlying insurance** as of the inception of this **policy period**."

82.     "Ultimate net loss" is defined in the Excess Policy as "the sums payable under this Policy in excess of all **underlying insurance** after making deductions for all recoveries, salvages or other valid and collectible insurance."

83.     "Underlying insurance" is defined in the Excess Policy as the Primary Policy.

84.     Unlike the Primary Policy, which does not say in its insuring agreements that it provides excess coverage, the insuring agreements in the Excess Policy state that the Excess Policy only pays loss in excess of amounts covered by the Primary Policy.

85.     Here, Plaintiffs' "ultimate net loss" exceeds the limits of the Primary Policy and the self-insured retention amount of the Primary Policy.

### 3.     Excess Policy Defense Obligation

86.     The Excess Policy also provides that upon "exhaustion of the applicable limits of insurance of **underlying insurance** in accordance with SECTION III. ATTACHMENT, we shall have the right and duty to defend the insured against a claim or suit to which this Policy applies."

87.     Because Plaintiffs' losses covered under the Primary Policy exceed the limits and self-insured retention of the Primary Policy, the underlying insurance is exhausted and Underwriters have the duty to defend the Underlying Lawsuits under the Excess Policy.

### 4.     Excess Policy's "Other Insurance" Clause

88.      Underwriters have refused to provide coverage based on an other insurance provision in the Excess Policy.

89.     The other-insurance clause in the Excess Policy states: "If other valid and collectible insurance is available to the insured covering a loss also covered by this Policy, other

than a policy that is specifically written to apply in excess of this Policy, the insurance afforded by this Policy shall apply in excess of and shall not contribute with such other insurance."

90.     For the reasons set forth above with respect to the Primary Policy, the other insurance clause does not allow the Underwriters to avoid providing coverage. *Supra* ¶¶ 61-73. Specifically, other insurance clauses are never a basis for an insurer to avoid providing coverage to its policyholder and, even if they were, no "valid and collectible insurance is available to the insured covering a loss also covered by" the Pollution Policies.

91.     Insurers' refusal to defend or provide coverage to Plaintiffs in the Underlying Lawsuits is without legitimate or arguable basis, and Insurers are acting in bad faith, with an improper motive, and with reckless indifference to Plaintiffs' rights, by continuing to deny coverage.

## VIII.   JURY TRIAL DEMANDED

92.     Plaintiffs demand a jury trial on all issues triable to a jury.

## IX.     CAUSES OF ACTION

**A.     Count I: Breach of Contract**

93.     Plaintiffs repeat and reallege the allegations in the preceding paragraphs.

94.     The Pollution Policies are valid and enforceable contracts between Plaintiffs and Insurers.

95.     Plaintiffs performed all obligations under and complied with all applicable provisions of the Pollution Policies and all conditions have occurred or been satisfied. Alternatively, any such obligations, provisions, and conditions have been waived or excused or are otherwise inapplicable.

96.     The Pollution Policies' insuring agreements have been triggered, and the Insurers owe coverage to Plaintiffs. The Insurers must therefore defend and indemnify Plaintiffs.

97. The other insurance clauses in the Pollution Policies are legally irrelevant to whether insurance coverage is owed under the Pollution Policies' insuring agreements.

98. In any event, the other insurance clauses have not been properly invoked because no "valid and collectible" insurance "is available for" all amounts Plaintiffs seek in this suit.

99. Insurers breached the Pollution Policies by refusing to defend Plaintiffs in the Underlying Lawsuits.

100. Insurers are acting in bad faith with an improper motive, and with reckless indifference to Plaintiffs' rights in refusing to defend Plaintiffs and by denying coverage.

101. Plaintiffs have sustained and continue to sustain damages as a result of Insurers' breach of the Pollution Policies. For instance, Plaintiffs paid attorneys to defend the Underlying Lawsuits when Insurers should have been paying attorneys to do so given their contractual duty to defend the Underlying Lawsuits.

**B.    Count II: Declaratory Judgment**

102. Plaintiffs repeat and reallege the allegations in the preceding paragraphs.

103. Plaintiffs seek the Court's declaration of the parties' rights and duties under the Pollution Policies pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001(9). Plaintiffs ask the Court to declare that:

    a.    The other insurance clauses in the Pollution Policies do not allow Insurers to avoid coverage and instead can be relied upon by Insurers to seek contribution from other insurers;

    b.    Even if the other insurance clauses could allow Insurers to avoid coverage under some circumstances, there is no valid and collectible insurance available for amounts Plaintiffs are seeking to recover from Insurers in this lawsuit;

    c.    The Primary Policy is a primary policy under which Insurers must provide coverage to Plaintiffs upon exhaustion of that policy's self-insured retention;

d.     Because Plaintiffs have paid or are legally obligated to pay amounts covered by the Primary Policy in excess of the policy's self-insured retention and $1,000,000, Insurers must pay $1,000,000 and those amounts exhaust the limits of the Primary Policy;

e.     Plaintiffs have paid or are legally obligated to pay amounts covered by the Excess Policy in excess of the $1,000,000 limits of the Primary Policy and Underwriters must pay those amounts until the limits of the Excess Policy are exhausted; and

f.     Underwriters must defend Plaintiffs in the Underlying Lawsuits until the Excess Policy's limits are exhausted.

104.     An actual controversy within the Court's jurisdiction exists between Plaintiffs and Insurers concerning Insurers' obligation to defend and indemnify Plaintiffs in the Underlying Lawsuits.

105.     The controversy between Plaintiffs and Insurers is ripe for judicial review.

106.     Accordingly, Plaintiffs seek a declaration from the Court that Insurers are presently obligated to defend and indemnify Plaintiffs with respect to the Underlying Lawsuits.

**C.     Count III: Bad Faith**

107.     Plaintiffs repeat and reallege the allegations in the preceding paragraphs.

108.     Insurers acted in bad faith in their refusal to provide a defense and indemnification to Plaintiffs in the Underlying Lawsuits.

109.     Insurers did not have a legitimate or arguable reason for refusing to defend Plaintiffs and by denying coverage.

110.     Plaintiffs have suffered and continue to suffer damages as a result of Insurers' bad faith and are entitled to punitive damages.

## X.    PRAYER FOR RELIEF

111.   Plaintiffs request judgment against Insurers as follows:

   a.   An order consistent with paragraph 103 declaring the respective rights, duties, and obligations of the parties pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001(9);

   b.   For damages, including actual, compensatory, consequential, special, exemplary, in an amount to be proved at trial;

   c.   For punitive damages;

   d.   Interest, including pre-judgment, post-judgment, and statutory interest;

   e.   An award of attorneys' fees and costs of suit incurred; and

   f.   For such other relief, including any equitable relief, as the Court deems just and proper.

Dated:  January 19, 2024        Respectfully submitted,
        Houston, Texas

                                */s/ Joseph P. Rovira*
                                _____
                                Timothy A. ("Tad") Davidson II (TX Bar No. 24012503)
                                Joseph P. Rovira (TX Bar No. 24066008)
                                Philip M. Guffy (TX Bar No. 24113705)
                                **HUNTON ANDREWS KURTH LLP**
                                600 Travis Street, Suite 4200
                                Houston, Texas 77002
                                Tel:    713-220-4200
                                Fax:    713-220-4285
                                Email:  taddavidson@HuntonAK.com
                                        josephrovira@HuntonAK.com
                                        pguffy@HuntonAK.com

                                Lawrence J. Bracken II (admitted *pro hac vice*)
                                Bank of America Plaza, Suite 4100
                                600 Peachtree Street, NE
                                Atlanta, GA 30308
                                Tel:    404-888-4000
                                Fax:    404-888-4190
                                Email:  lbracken@HuntonAK.com

                                Patrick M. McDermott (admitted *pro hac vice*)
                                Riverfront Plaza, East Tower
                                951 East Byrd Street
                                Richmond, Virginia 23219
                                Tel:    804-788-8200
                                Fax:    804-788-8218
                                Email:  pmcdermott@HuntonAK.com

                                *Attorneys for Limetree Bay Terminals, LLC d/b/a Ocean Point*
                                *Terminals and David M. Dunn, as Liquidating Trustee of the*
                                *LBR Liquidating Trust*

**Appendix A**

